SHIVERS, Judge.
Appellant appeals the denial, after an evidentiary hearing, of his petition for post-conviction relief. We reverse and remand the matter for a new trial.
The appellant, Porterfield (defendant in the trial court) originally moved for post-conviction relief pursuant to Fla.R.Crim.P. 3.850 on July 13, 1983, alleging prosecutorial misconduct on the part of Assistant State Attorney Ron Johnson for his failure to correct false evidence by a key witness for the prosecution. Specifically, Porter-field alleged that a “deal” had been struck between Prosecutor Johnson and Mr. Green (attorney for Porterfield’s co-defendant, Curtis Glenn), whereby Glenn would receive several concessions in exchange for his trial testimony against Porterfield. Upon direct examination at trial by Prosecutor Johnson, Glenn stated that he had received no promises in return for his testimony other than being “considered for some protection by the State Attorney’s Office while in jail.” According to Porter-field, Prosecutor Johnson’s failure to correct this false evidence could have affected the jury’s estimate of the witness’ credibility and necessitated post-conviction relief in the form of a new trial.
Porterfield’s motion was summarily denied by the trial court. After review of the denial, this court concluded that the appellant had made a prima facie showing of entitlement to relief and reversed and remanded for an evidentiary hearing. Porterfield v. State, 442 So.2d 1062 (Fla. 1st DCA 1983).
It is the second denial, after the August 10, 1984 evidentiary hearing, which is the subject of this appeal. After reviewing the record, we feel that there was not competent, substantial evidence to support the trial court’s denial of post-conviction relief and, accordingly, we reverse and remand for a new trial.
The United States Supreme Court has stated, in Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959):
The principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness. The jury’s estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant’s life or liberty may depend.
360 U.S. at 269, 79 S.Ct. at 1177.
Further, in Campbell v. Reed, 594 F.2d 4 (4th Cir.1979), the Fourth Circuit applied the principles of Napue v. Illinois to reverse a conviction in a fact situation similar to the instant case. In that case, a code-fendant (Miller) testified at trial against Campbell. As in the instant case, the co-defendant’s testimony in Campbell was ex *884 tremely important as he was the only witness who could link the defendant to the crime. On cross-examination the codefend-ant specifically denied that he had been promised any concessions in exchange for his testimony when in fact there was a “deal” in existence at the time of the trial. At the prosecutor’s request, the witness’ attorney did not inform the witness of the plea agreement prior to trial. He did, however, tell him that if he testified against the defendant “everything would be all right” and “there were things going on that it would be better for him not to know.” 594 F.2d at 6. Miller’s attorney expressed his opinion by affidavit that, based on their conversations prior to trial, Miller should have known that an agreement had been reached.
In finding that the defendant had been denied due process in violation of the Fourteenth Amendment, the court held that the fact that the witness was unaware of the exact terms of the agreement only increased the significance, for the purpose of assessing his credibility, of his expectation of favorable treatment. Since a tentative promise of leniency could be interpreted by the witness as being contingent on his testimony, there wouíd be an even greater incentive for him to “make his testimony pleasing to the prosecutor.” The court stated:
Not only did the prosecutor allow the jury to be misled as to Miller’s reasons for testifying, but by keeping Miller ignorant of the terms of the plea bargain, he contrived a means of ensuring that this evidence would not come before the jury.
594 F.2d at 7.
We think the facts of the instant case warrant the same outcome as those in Campbell v. Reed and that the evidence does not support the trial court’s finding that “there was no bargain between the State of Florida and Curtis Glenn concerning his testimony beyond consideration for his safety.”
We find two letters which were introduced as evidence at the hearing below to be especially indicative of the existence of a “deal.” In the first, a March 3, 1981 letter to Prosecutor Johnson, Mr. Green stated that “[fjollowing your telephone call of yesterday afternoon I talked to Curtis Glenn about the alternatives available to him .... Glenn has indicated a willingness to assist the State under the following terms.” As part of the six “terms” listed in the letter, Green stated that “Mr. Glenn will plead guilty to counts one through six of the information as amended and cooperate with the State’s investigation and prosecution.” The letter also indicated that the State would (1) reduce Count 3 of the information from attempted murder to aggravated battery, (2) transfer Glenn to a safer jail and use its influence to assure Glenn’s safety after sentencing, and (3) make Glenn’s cooperation known at the sentencing hearing, recommend that the trial court not retain jurisdiction over Glenn’s sentence, and agree to concurrent sentences.
A second letter, written by Johnson to Green in confirmation of an April 9, 1981 telephone conversation, was also introduced as evidence at the hearing. That letter stated, in part:
It is my understanding that Curtis Glenn will enter pleas of guilty to all counts in the information. In return for his cooperation in the investigation and for his truthful trial testimony, if needed, the State will recommend to the Court that the Defendant be adjudicated guilty of the lesser included offense of Aggravated Battery under Count III of the information. It is my further understanding that this recommendation will not be relayed to your client and will be followed by the Court. The State has no objection to the Defendant receiving concurrent sentences on all counts and will not recommend to the Court to retain one-third jurisdiction over his sentence. It is my understanding that the Court has agreed to go along with this since the State is not recommending the same.
The letter went on to reiterate the other “terms” that were stated in the March 3, 1981 letter.
*885 In addition to these two letters, evidence of the existence of a “deal” was also presented through the testimony of Mr. Green and Mr. Johnson at the evidentiary hearing. Green stated that he had talked to Johnson on several occasions regarding the possibility of a lesser sentence in exchange for Glenn’s testimony. While it was his recollection that he and Johnson had never reached a firm agreement, he did concede that they had a “tacit understanding” such that Green would have been “exceptionally disappointed and not inclined to enter into other negotiations with the State” had Johnson not followed through with the items listed in the letter. Green also testified that all discussions between himself and Johnson were conducted outside of Glenn’s presence. He stated that he did tell Glenn, however, that he “had been working on his behalf with the State Attorney’s office, in terms of attempting to work out something that would be in his best interest” and that it was in his best interest that Green not discuss the details with him. When asked at the hearing whether it was a fair statement that, “although you didn’t verbally tell him anything, it’s true that the clear impression that he got was that you knew something that would help him that he didn’t know,” Green replied “I think that’s probably a fair statement.”
Mr. Johnson, on the other hand, testified at the hearing that a firm deal had been reached between himself and Green, but that the information was not to be provided to Glenn.
In sum, we believe first that there was insufficient evidence to support the trial court’s finding that an agreement was never reached between Green and Johnson. While the agreement may not have been “ironclad,” even the lower court stated in its order that “[t]here may have been a tacit understanding between Prosecutor Johnson and defendant’s attorney, Green.” (emphasis supplied). We do not think the application of the Napue and Campbell cases should turn upon whether the agreement was “firm” or “tacit” but should turn instead upon whether there was a “tentative promise of leniency [which] might be interpreted by [the] witness as contingent upon the nature of his testimony.” Campbell, 594 F.2d at 7. We believe there was an understanding of a tentative promise by the witness in this case.[1]
Second, since Glenn was the only witness who could link Porterfield to the crime, his testimony was material and we feel there is a likelihood that the jury’s verdict might have been different had it been aware of Glenn’s motivation to testify.
Accordingly, the trial court’s denial of appellant’s motion for post-conviction relief is reversed and this matter is remanded for a new trial.
REVERSED and REMANDED.
ERVIN and JOANOS, JJ„ concur.

. Also introduced into evidence at the hearing were two letters written by Glenn to a friend incarcerated at another prison. In the two letters, dated 3/12/81 and 7/13/81, Glenn stated that he had made a "deal” with the State.